RONALD O. KAYE, SBN 145051
Email: rok@kmbllaw.com
KEVIN J. LaHUE, SBN 237556
Email: klahue@kmbllaw.com
KAYE, McLANE, BEDNARSKI & LITT, LLP
975 East Green Street
Pasadena, California 91106
Tel: (626) 844-7660
Fax: (626) 844-7670

Attorneys for Plaintiff s
ANA MARIA GONZALEZ LOPEZ
PEDRO DERKEVORKIAN

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANA MARIA GONZALEZ LOPEZ, PEDRO DERKEVORKIAN, AND THE ESTATE OF SERGIO DERKEVORKIAN, <br><br> Plaintiffs, <br><br> vs. <br><br> COUNTY OF KERN; SHERIFF DONNY YOUNGBLOOD; BILL WALKER, DIRECTOR KERN COUNTY MENTAL HEALTH DEPARTMENT; DEPUTY ASHLEY MARCUM (#202548);  AND DOES 1-10, INCLUSIVE, <br><br> Defendants. | **CASE NO: 17-CV-000864-AWI-JLT [HON. JENNIFER L. THURSTON]** <br><br> **FIRST AMENDED COMPLAINT FOR DAMAGES:** <br> **(1) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, WRONGFUL DEATH;** <br> **(2) DEPRIVATION OF CIVIL RIGHTS, 42 U.S.C. §1983, *MONELL* VIOLATIONS.** <br> **(3) DEPRIVATION OF CIVIL RIGHTS 42 U.S.C. §1983, SUPERVISORY LIABILITY;** <br> **(4) NEGLIGENCE;** <br> **(5) VIOLATION OF GOVERNMENT CODE §845.6 – FAILURE TO PROVIDE IMMEDIATE MEDICAL CARE** <br> **(6) VIOLATION OF THE ADA, 42 U.S.C. §12101, and CALIFORNIA UNRUH ACT, CIVIL CODE §51 DEMAND FOR JURY TRIAL; DECLARATIONS OF PLAINTIFFS PURSUANT (§377.60)** |

# I.  **JURISDICTION AND VENUE**

1.      This action is brought by Plaintiffs ANA MARIA GONZALEZ LOPEZ, PEDRO DERKEVORKIAN, AND THE ESTATE OF SERGIO DERKEVORKIAN pursuant to 42 U.S.C. §1983.

2.      This Court has jurisdiction under 28 U.S.C. §1343(4) for violations of the 1871 Civil Rights Enforcement Act, as amended, including 42 U.S.C. §1983, and under 28 U.S.C. §1331.

3.      The acts and omissions complained of commenced on May 3, 2016 and continued until May 8, 2016, within the Eastern District of California. Therefore, venue lies in this District pursuant to 28 U.S.C. §1391.

4.      Plaintiffs timely filed an administrative claim with the County of Kern pursuant to Cal. Gov't Code §910.  The claim was submitted to the Kern County Board of Supervisors on November 1, 2016 and was not acted upon by the Board. The claim was deemed rejected by operation of law 45 days after the date the claim was so presented.  Notice of rejection was deposited in the mail on January 3, 2017.

# II.  **PARTIES**

5.      Plaintiff ANA MARIA GONZALEZ is the mother, successor in interest, and an heir at law of Sergio Derkevorkian, the deceased. Plaintiff is a resident of the State of California and resided within the jurisdiction of the State of California at all times herein alleged. She brings this claim for herself personally, as Sergio Derkevorkian's successor in interest and heir, as the personal representative of the estate and, as applicable, pursuant to California Code of Civil Procedure §§377.30 and 377.60.  Ms. Gonzalez's declaration pursuant to §377.60 is attached hereto.

6.      Plaintiff PEDRO DERKEVORKIAN is the father, successor in interest, and an heir at law of Sergio Derkevorkian, the deceased. Plaintiff is a resident of the State of California and resided within the jurisdiction of the State of

California at all times herein alleged. He brings this claim for himself personally, as Sergio Derkevorkian's successor in interest and heir, as the personal representative of the estate and, as applicable, pursuant to California Code of Civil Procedure §§377.30 and 377.60.  Mr. Derkevorkian's declaration pursuant to §377.60 is attached hereto.

7.     Defendant COUNTY OF KERN ("COUNTY") is, and at all times herein alleged was, a public entity organized and existing under the laws of the State of California. The Kern County Sheriff's Office, and the Kern County Department of Mental Health, at all times herein alleged were agencies of the County of Kern.

8.     Defendant SHERIFF DONNY YOUNGBLOOD ("SHERIFF YOUNGBLOOD") was, at all times mentioned herein, the Sheriff for Kern County and in charge of the Kern County Jails including, including the Central Receiving Facility ("CRF") in Bakersfield, California, and Lerdo Pre-Trial Facility ("Lerdo") in Bakersfield, California where Sergio Derkevorkian resided at the time of his suicide attempt.  SHERIFF YOUNGBLOOD has served as the Sheriff of Kern County from 2007 to the present.  By California law, the Sheriff is answerable for the safekeeping of inmates in his custody.  Cal. Gov't Code §§26605, 26610; Cal. Pen. Code §4006.  SHERIFF YOUNGBLOOD was responsible for the management and control of all Kern County Jails, was responsible for the administration of CRF and Lerdo; for the selection, promotion, supervision, training, discipline and retention of agents and employees working within CRF and Lerdo, including custodial staff, counselors, advisors, nurses, doctors, physician assistants, medical staff, mental health staff, education staff, and supervisors; and for the implementation of policies and procedures at CRF and Lerdo.  He was responsible for the care, custody and control of all inmates housed in CRF and Lerdo.  SHERIFF YOUNGBLOOD is regularly provided with reports concerning

the treatment of mentally ill inmates, improper classification of inmates in the jails, jail suicides, and other violations involving the housing, care, mental health care, and treatment of inmates at CRF and Lerdo.  Pursuant to California law and his duties as the Sheriff of Kern County, SHERIFF YOUNGBLOOD is sued in his individual capacity, as a supervisor for his own culpable action or inaction in the training, supervision or control of his subordinates, or his acquiescence in the constitutional deprivations which this Complaint alleges, or for conduct that showed reckless or callous indifference for others.  SHERIFF YOUNGBLOOD's affirmative conduct involves his knowing failure to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which he knew or reasonably should have known would cause others to inflict a constitutional injury on Sergio Derkevorkian.

9.     Defendant BILL WALKER ("WALKER"), was at all times mentioned herein the Director of  Kern County Department of Mental Health and in charge of Jail Mental Health operations in Kern County, including CRF and Lerdo where Sergio Derkevorkian resided at the time of his suicide.  WALKER is responsible for the management and administration of mental health services of CRF and Lerdo; for the selection, promotion, supervision, training, discipline and retention of mental health workers working within CRF and Lerdo, including counselors, nurses, doctors, physician assistants, mental health staff and supervisors; and for the implementation of mental health policies and procedures at CRF and Lerdo.   WALKER is regularly provided with reports concerning the treatment of mentally ill inmates, jail suicides, and other violations involving the mental health care and treatment of inmates at CRF and Lerdo.  Pursuant to California law and his duties as the Director of the Department of Mental Health of Kern County, WALKER is sued in his individual capacity, as a supervisor for his own culpable action or inaction in the training, supervision or control of his

subordinates, or his acquiescence in the constitutional deprivations which this Complaint alleges, or for conduct that showed reckless or callous indifference for others.  WALKERS' affirmative conduct involves his knowing failure to ensure enforcement of policies, rules or directives that set in motion a series of acts by others which he knew or reasonably should have known would cause others to inflict a constitutional injury on Sergio Derkevorkian.

10.    DEPUTY MARCUM (#202548) was at all times mentioned herein a member of the Kern County Sherriff's Office assigned to CRF, and was responsible for providing reasonable security and safety to the inmates, including Sergio Derkevorkian, and for providing them access to mental health and medical care, treatment and intervention to prevent attempts of suicide by inmates, and reasonable screening, booking, and intake to identify inmates who posed a suicide risk.  She is sued in her individual capacity.

11.    Plaintiffs are informed and believe and thereon allege that Defendants sued herein as DOES 1 through 10, inclusive, were employees of the County of Kern, including but not limited to deputies and civilian staff of the Kern County Sheriff's Office, and employees of the Department of Mental Health, and were at all relevant times acting in the course and scope of their employment and agency. Each Defendant is the agent of the other.  Plaintiffs allege that each of the Defendants named as a "DOE" was in some manner responsible for the acts and omissions alleged herein, and Plaintiffs will ask leave of this Court to amend the Complaint to allege such names and responsibility when that information is ascertained.

### III.  <u>GENERAL ALLEGATIONS</u>

12.    Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, each of the Defendants was the agent and/or employee and/or co-conspirator of each of the remaining Defendants, and in doing the things

4

hereinafter alleged, was acting within the scope of such agency, employment and/or conspiracy, and with the permission and consent of other co-Defendants.

13. Each paragraph of this complaint is expressly incorporated into each cause of action which is a part of this complaint.

14. The acts and omissions of all Defendants were engaged in maliciously, callously, oppressively, wantonly, recklessly, and with deliberate indifference to the rights of Plaintiff.

## IV.  FACTUAL ALLEGATIONS

### A.  Background

15. In May 2016, Sergio Derkevorkian ("Mr. Derkevorkian") was 29 years old. He was a high school graduate and attended junior college where he played football.  He worked in security, construction, and other manual labor.  At the time of his death he lived with his parents with whom he shared a very close relationship his entire life.  In 2016 he was hospitalized on two separate occasions for drug overdoses which were considered suicide attempts.  During this period he nonetheless remained emotionally connected with his parents, and his older sister Cristina.

### B.  ARREST BY MOJAVE CHP

16. At approximately 3 a.m. on May 3, 2016 Mr. Derkevorkian called 911 to report that he was involved in a single car accident on Silver Queen Road near State Route 14 in Mojave, California.  Mojave CHP responded to the scene of the accident.  During the CHP investigation, Mr. Derkevorkian displayed bizarre and erratic behavior.  He claimed that he was having problems breathing and experiencing a possible panic attack.  He acted "paranoid" and stated he thought someone was going to kill him.  At various times he stated that he "just wanted to call his family," "that he is going to get hurt," that he didn't want to "die out here," and he couldn't "think straight."  An ambulance was called to the scene and noted

Mr. Derkevorkian's rapid heart rate and high blood pressure.  Mr. Derkevorkian refused transportation to the hospital.  He suggested that the officers arrest him and when they inquired why, he stated "I'm a danger to myself."  When asked if he was "tripping on drugs" he said "no man it's not even that."

17.    The Mojave CHP officer concluded that Mr. Derkevorkian was under the influence of a controlled substance and he placed him under arrest at approximately 5:44 a.m.  The CHP then transported Mr. Derkevorkian to the Mojave CHP station to conduct a Drug Recognition Evaluation.  The evaluation was conducted by CHP Officer Lugo.  During the evaluation, Mr. Derkevorkian became increasingly "paranoid and disillusioned" stating that the CHP had promised to help him and was not providing help.  He paced around the Mojave CHP office.  He stated that he was cooperating with the CHP because they promised they would get a doctor to help him with his paranoia and transport him to a rehab center to help with his drug problem.

18.    CHP Officer Lugo transported Mr. Derkevorkian to the Kern Medical Center.  During transport, Mr. Derkevorkian unbuckled his seatbelt and constantly looked out the rear windows and attempted to look behind him.  He stated that the "Grim Reaper" was behind him and he was afraid.  He stated that he had severe head injuries from previous incidents, and expressed paranoia and trouble breathing.

**C.    KERN MEDICAL CENTER**

19.    When Mr. Derkevorkian arrived at the Kern Medical Center, he became emotionally unstable and began to cry and scream.  He falsely accused the CHP of deliberately placing drugs in his rectum.  Inside the hospital, he began yelling and stating he was the "victim."  When a nurse gave him a cup of water, he became upset and claimed she had poisoned the water.  He stated that he believed everyone around him was trying to drug him and was laughing at him.

6

20.     An on-duty doctor assessed Mr. Derkevorkian with CHP present. Mr. Derkevorkian repeatedly stood up and attempted to move near to the doctor, stating that he wanted to speak with him privately. The doctor informed the CHP that, in essence, he was not comfortable speaking privately with Mr. Derkevorkian and that Mr. Derkevorkian was unstable.

21.     Mr. Derkevorkian remained standing after the doctor left the area. He refused to sit down even after being instructed by CHP and stated that he had done nothing wrong and needed help. While waiting for his blood to be drawn, he began to panic. He dropped to his knees and curled in a fetal position with his head tucked between his legs. He accused the CHP of doing something to him. He later stood up and started yelling. The registered nurse assigned to the blood draw indicated she was uncomfortable taking his blood at that time as he had to have one hand un-cuffed for the procedure. Mr. Derkevorkian again began crying and apologized to the nurse, signing a consent form for the blood draw.

22.     After the blood draw, Mr. Derkevorkian kicked over several chairs and attempted to drop down to the ground. A Kern County Sheriff's Deputy assisted the CHP officer get him back up to his feet. The CHP officer described his behavior as "bizarre." Mr. Derkevorkian repeated his claims that the CHP had touched him and placed drugs in his rectum. He was ultimately placed by the CHP in a "serenity room" inside the hospital, a room traditionally reserved for grieving family members, which was empty at that time. Inside the serenity room, he began yelling and kicking his shoes off. He stated that he felt trapped and could not get the drugs out of his rectum. The CHP officer described this behavior as "bizarre and erratic."

23.     While still in the serenity room, Mr. Derkevorkian screamed, yelled, cried and accused passersby of being unfair and "out to get him." Standing outside the room, the CHP officer notified a Sergeant Dotson (#17457) of his status. Sgt. Dotson related this information to the Bakersfield Jail (CRF) and requested Kern

County Sheriff's Deputies for assistance upon Mr. Derkevorkian's arrival to the facility.  Mr. Derkevorkian was discharged from the hospital with instructions to follow up with a primary care physician in one week.

**D.   CRF**

24.     Mr. Derkevorkian was escorted out of the hospital to the CHP patrol car and transported by CHP Officer Lugo for booking.  Based on the prior notice, upon his arrival at CRF at approximately 11:00 a.m. there were multiple Kern County Sheriff's deputies waiting outside to assist in Mr. Derkevorkian's transport into the facility.  These deputies included Defendant Marcum, Deputy John Comparan, Senior Deputy Steven Wright, Sergeant Mark Hines, and Commander Todd Bishop.  A transporting officer calling the CRF facility ahead of time to warn of a potentially uncooperative inmate occurred on average less than 10 times per 100 arrests.   Deputies receiving new inmates at CRF were not trained to attempt to get as much information as possible from a transporting officer like CHP Officer Lugo, and were not trained to inquire of the transporting officer whether an arrestee exhibiting bizarre behavior during the booking process at CRF was exhibiting similar behavior during their arrest and transportation.

25.     Upon entering the CRF, Mr. Derkevorkian claimed drugs were still up in his rectal area and that doctors had put drugs there.   He stated that drugs were placed in his rectum by the CHP, and that doctors and nurses placed drugs in his shoes.  The CHP officer also informed Kern County deputies of Mr. Derkevorkian's claims.  In response, deputies placed Mr. Derkevorkian in a body scanner, but no drugs were in fact recovered from his rectum.  Receiving Deputy Comparan believed that based on this behavior, Mr. Derkevorkian was seeing things that weren't there and was delusional. Similarly, Defendant Marcum believed that based on this behavior Mr. Derkevorkian was possibly delusional.

26.     Mr. Derkevorkian was taken into the Inmate Reception Center ("IRC") area of CRF for medical screening and to be searched.  He was in the IRC

with Deputy Marcum, Deputy Comparan, Officer Lugo, and for some period of time, with Senior Deputy Steven Wright.  In the IRC, Mr. Derkevorkian became fidgety and, on several occasions, deputies placed their own hands over his wrists on a table to stop him from moving.

27.    Mr. Derkevorkian remained in this position, swaying back and forth, and generally inattentive and distracted, when Defendant Marcum began the standard medical screening questions.  In response to Mr. Derkevorkian's lack of attention and constant movement, Deputy Comparan advised Mr. Derkevorkian that he is "all over the place," "this is his one chance" and "if you mess it up again you will go to sobering and go in a cold tank."

28.    As part of the booking process, Defendant Marcum asked Mr. Derkevorkian the medical screening questions, including two questions asked in rapid succession related to "if he has ever attempted suicide?" Defendant Marcum posed the questions to Mr. Derkevorkian at a very fast pace. In response, Mr. Derkevorkian looked forward, not facing Defendant Marcum, and   shook his head from side to side.  She then asked him if he "is suicidal at the present time?"  In response, Mr. Derkevorkian neither shook his head nor gave an audible response. Simultaneously, during the booking questioning a person is heard screaming at a loud volume in the background.  Other than these two questions during the medical screening, Defendant Marcum asked Mr. Derkevorkian no other questions related to possible suicidality.

29.    In addition to asking the suicide related questions at a high rate of speed, Defendant Marcum paraphrased of the standard questions and omitted others entirely.  She believed it was consistent with her training and CRF policy to omit certain questions, nor was she required to read them verbatim.  Defendant Marcum and Deputy Comparan both believed that their training and CRF policy did not require a verbal "yes" or "no" answer from the inmate to the medical screening questions, including those related to suicidality.

9

30.    Defendant Marcum specifically asked the medical risk questions, including two suicide questions, at a high rate of speed *intentionally.*  She understood that the accuracy of the screening in the "IRC" room to be secondary to the possible risk to officer safety.  She therefore intentionally asked Mr. Derkevorkian these crucial questions quickly to "maximize officer safety."  She specifically was trained to "minimize" her interaction when the inmate was in the IRC.  Deputy Comparan, on the other hand, stated that it was inconsistent with his training and the policy at CRF to rush through the medical screening questions with an inmate in the IRC.

31.    During the screening process, Deputy Comparan asked Mr. Derkevorkian a series of "PREA [Prison Rape Elimination Act] HOLDING CELL QUESTIONS."   Mr. Derkevorkian answered "yes" to the question "Do you have any concerns about your sexual orientation, gender identity, mental health, or a disability that would make you feel unsafe in a holding cell with other inmates?"  Despite the fact that Deputy Comparan did not believe that Mr. Derkevorkian was an LGBT inmate or had any issues with gender identity or disability (by process of elimination suggesting a mental health issue) there was no indication why Mr. Derkevorkian answered "yes" that he had concerns being in a cell with other inmates.

32.    Senior Deputy Steven Wright, a supervisor in the CRF, is present at times when Mr. Derkevorkian is in the IRC, including when Defendant Marcum asks the suicide risk questions.  Because of the transporting officer's request for assistance with Mr. Derkevorkian, Senior Wright wanted to observe Mr. Derkevorkian's booking process until he was housed and be available if any assistance was necessary.  Senior Wright believes that all of the actions taken with respect to Mr. Derkevorkian, including the administration of the medical screening questions, temporary housing placement, and failure to refer to correctional mental health (CMH) were consistent with his understanding of his training and CRF

policy.  He does not recall being trained in suicide risk assessment and could not recall ever receiving any specific training from correctional mental health regarding inmate mental health issues.

33.    Defendant Marcum understood that "receiving" deputies are the "gatekeeper" in the receiving process, often seeing an inmate prior to any mental health professional. Consequently, "receiving" deputies have a responsibility to attempt to identify potential mental health issues including suicidality, and to refer inmates to mental health professionals.  However, she never received training that the leading cause of inmate death in jail facilities is suicide, and does not recall that there were two prior suicides at CRF in the five months prior to Mr. Derkevorkian's booking.  Correspondingly, in CRF, a suicide attempt did not trigger a debriefing of all receiving or other housing personnel; there were no meetings or training regarding how personnel could respond differently following a prior suicide attempt, including Mr. Derkevorkian's.

34.    Both Defendant Marcum and Comparan received training that bizarre behavior is a common indicator of inmate mental health issues.  Defendant Marcum does not recall, however, being trained that:

- suspiciousness/paranoia is a sign of mental illness;
- that intoxication is a warning sign of suicidality;
- that hallucinations or paranoia are a warning sign of suicidality; or
- that a symptom of withdrawal from methamphetamine is depression.

Similarly, Deputy Comparan does recall being trained about any connection between mental illness or suicide and intoxication or that methamphetamine withdrawal creates a higher risk for suicide.  Both deputies stated that information received from intoxicated inmates is less reliable.  Senior Wright, who supervised parts of Mr. Derkevorkian's reception at CRF, was similarly unaware of receiving training on these issues.

35.   After the medical screening and PREA questions, Defendant Marcum determined Mr. Derkevorkian was under the influence or ("UTI") and placed him in "temporary administrative segregation" in a "DEO booth" pending classification.   There are no written policies regarding when an inmate should be considered "UTI" as opposed to "intoxicated" – which requires the use of a sobering cell and triggers mandatory procedures including checks at specified intervals.   There is also no written policy at CRF regarding when a "DEO booth" should be used as temporary housing.

36.   Defendant Marcum does not recall what if any information she gave CRF classification officers regarding Mr. Derkevorkian.   CRF policy and training does not require any written notation this information.   Detention Deputy Doug Hutchison entered Mr. Derkevorkian's "initial classification."   This classification was based on the recommendation of the receiving deputies (Marcum and Comparan) and he relied on the information they enter into the system.

37.   Deputy Hutchison does not recall ever receiving any training in mental health, nor participating in any meetings following an inmate attempted suicide at CRF.   Hutchison received no training on when and how to ask suicide risk questions and believed it was completely within his discretion when and if to ask suicide risk questions during a classification interview.

38.   He believed that if an inmate was expected to be released from CRF custody in a short period of time (such as after 12 hours if they were arrested for being under the influence) classification officers may never interview them. Correspondingly, Hutchison never performed an initial classification interview with Derkevorkian as he was listed as being under the influence.   He received no training on the period of time in which a classification officer should interview an inmate.   Even if an inmate was booked "pending classification" the inmate may not be interviewed.   Further, classification officers would sometimes not have time to interview inmates.   Hutchison expected, however, that if an inmate like Mr.

Derkevorkian entered CRF on May 3, 2016 and was transferred to another facility on May 5, 2016, he would be interviewed by a classification deputy during that time period. On information and belief, Mr. Derkevorkian was never interviewed by a classification deputy.

39.     Mr. Derkevorkian remained at CRF until his arraignment in Kern Superior Court on May 5, 2016.  At his arraignment, he was charged with violating California Vehicle Code §23152 (Driving under the influence) and California Health and Safety Code §11500 (Under the influence of drugs).  His bail was set at $2,500.  His next court appearance was scheduled for May 12, 2016.

## E.   LERDO PRE-TRIAL

After court on May 5, 2016 Mr. Derkevorkian was transferred to Lerdo where he was again placed in administrative segregation.  Pursuant to policy, Mr. Derkevorkian should have been interviewed by classification staff after his transfer between institutions.  On information and belief, no interview by classification staff occurred.  Additionally, at no point during his stay at Lerdo did Mr. Derkevorkian receive any mental health treatment, intervention, counseling or evaluation.

40.     On May 5, 2016, Mr. Derkevorkian's family deposited $25 into his inmate commissary account.

41.     On May 6, 2016, at the direction of the family, a close family friend of the Derkevorkians – Mr. Corey Biggs - made two phone calls (lasting four and six minutes respectively) to CRF to inquire about Mr. Derkevorkian's status and well-being.  Each time he spoke directly with a person who identified herself as a Kern County Sheriff's Deputy.  During one of these phone calls, Mr. Biggs specifically advised the Deputy that they were concerned Mr. Derkevorkian was suicidal and, as a result, they were concerned for his safety.  The Deputy stated they could not release medical information but assured the family friend that Mr. Derkevorkian was safe.

13

42.     Kern County Sherriff's Office "Suicide Watch" Policy Directive #1
states, in relevant part: "Additional information *from any source* may be used to
support the decision to place an inmate on suicide watch." (Emphasis added.)
Kern County Sherriff's Department "Mentally disordered/developmentally
disabled inmates" Policy states in relevant part "Any Staff Member who becomes
aware of an inmate who appears to be suffering from any type of mental disorder
or developmental disability will segregate the inmate from the general inmate
population. *Staff will refer the inmate to Medical and Mental Health Staff for
evaluation as soon as possible*."  (Emphasis added.)

43.     Based on staffing at CRF, one of three non-sworn civilian employees –
Ms. Chelsey Reddell, Tanecia Crystian, or their supervisor Lamarka Banks –
would have been responsible for answering Mr. Biggs' phone call.  CRF would
receive similar calls advising about inmate suicidality on average 1-2 times per
week.  Despite this, no formal training was provided to these staff regarding how
to receive mental health information from the public pertaining inmates.  These
non-sworn employees further received no training in the identification of inmate
mental health or suicide risk.  Ms. Reddell believed that if she received such a call
she would simply transfer it to mental health – without assuring that someone from
mental health received the transferred call – but would not memorialize the notice
of suicidality in written form on a database or in CJIS and take no further steps to
insure that the specific inmate information was received.  Ms. Crystian believed
that she would transfer the call and also call the specific "deck" (housing unit)
where the inmate was located and notify a Sargent.  She stated from her location at
CRF, however, she was not provided the phone numbers for staff at Lerdo where
Mr. Derkevorkian was housed.

44.     On May 7, 2016 at approximately 2:41 p.m., Mr. Derkevorkian was
found hanging inside his cell by a noose created from his bedsheet attached to the

top of his bunk bed.  He was transported to the San Joaquin Hospital where he died on May 8, 2016.

45.     At no point during Mr. Derkevorkian's approximately five days in custody did he ever receive any referral to correctional mental health let alone any mental health treatment or interview.   This is despite the availability of correctional mental health staff from approximately 7:00 a.m. to 5:00 p.m. each day inside the jail facilities.

### F.   AFTER MR. DERKEVORKIAN'S DEATH

46.     On May 15, 2016 Deputy Comparan wrote an "incident report" regarding Mr. Derkevorkian's booking process on May 3, 2016.  This report was written more than a week after Mr. Derkevorkian's death, after Comparan reviewed a video of the booking, at the request of a supervisor, and with knowledge of potential litigation.  Comparan describes Mr. Derkevorkian has having "paranoia and delayed speech."  It also states that he "feared the arresting officer placed something in his anus" but confirmed that a subsequent body scan did not reveal any anomalies in that area.   He states "Derkevorkian was placed in ad seg due to his statements and demeanor, receiving deputies determined Derkevorkian would be better suited by himself."  This report was approved by Senior Wright on May 16, 2016.

47.   On May 24, 2016 Deputy Marcum wrote an "incident report" regarding Mr. Derkevorkian's booking process on May 3, 2016.  This report was written approximately three weeks Mr. Derkevorkian's death, after Marcum reviewed a video of the booking and Comparan's report, at the request of a supervisor, and with knowledge of potential litigation.  Marcum states that "Derkevorkian was having difficulty following instructions," "seemed paranoid and believed his arresting officer had placed something in his anal cavity," and was making "irrational statements."

48.  Inmate "Incident Reports" are entered into the "CJIS" system which shares information throughout the Kern correctional system.  The reports authored by Comparan and Marcum, more than a week after the suicide attempt, where the first time that Mr. Derkevorkian's bizarre behavior was entered into the CJIS system and thus available to reviewing custody staff, classification officers, and on information and belief – mental health staff.

49.  No Kern employee, including Defendant Marcum, received any punishment, reprimand, or even retraining as a result of Mr. Derkevorkian's death.

**G.  THE COUNTY OF KERN, KERN COUNTY SHERIFF AND THE KERN COUNTY DEPARTMENT OF MENTAL HEALTH DEFENDANTS VIOLATED THE FOURTH, EIGHTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION BY FAILING TO PROVIDE ADEQUATE MENTAL HEALTH SERVICES AND PROTECT SERGIO DERKEVORKIAN.**

50.  The Kern County jail system houses approximately 2400 inmates and approximately 70% are treated for mental illness.  In fact there is an entire wing at Lerdo devoted to the treatment of mentally ill inmates.

51.  Between May 1, 2001 and May 31, 2006 approximately 135 inmates attempted suicide in the CRF or Lerdo facilities.  Between January 2016 and May 31, 2016 – 20 inmates attempted suicides at these two facilities.  There were two suicides resulting in death at CRF in February 2016 alone – just three months before the Derkevorkian incident.

52.  On information and belief, policymakers in both the Kern County Sheriff and the Kern County Department of Mental Health were made aware of this ongoing suicide attempts and failed to take corrective action, allowing mental health and custodial conditions to promote suicidality and lack of mental health intervention.

**V.     PARTICIPATION, STATE OF MIND AND DAMAGES**

16

53.   All Defendants acted without authorization of law.

54.   Each Defendant participated in the violations alleged herein, or directed the violations alleged herein, or knew of the violations alleged herein and failed to act to prevent them. Each Defendant ratified, approved or acquiesced in the violations alleged herein.

55.   As joint actors with joint obligations, each Defendant was and is responsible for the failures and omissions of the other.

56.   Each Defendant acted individually and in concert with the other Defendants, and others not named, in violating Plaintiffs' rights.

57.   Each Defendant acted with a deliberate indifference to, or reckless disregard for, an accused's rights to adequate mental health care in a custodial facility.

58.   As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Mr. Derkevorkian suffered great fear, physical and mental suffering, anguish, confusion, anxiety, nervousness, and ultimately, loss of life during the time period in which Kern County Sheriff's Office and Department of Mental Health failed to provide appropriate psychiatric care and treatment for his urgent psychiatric condition, and in particular, suffered acute and unmitigated mental and physical suffering during the hours preceding his suicide attempt in May 2016.

59.   As a direct and proximate result of the aforesaid acts, omissions, customs, practices, policies and decisions of the Defendants, Plaintiffs have suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused Plaintiffs to sustain damages in a sum to be determined at trial.

60.   Due to the acts of the Defendants, Plaintiffs have suffered, and continue to suffer, and are likely to suffer in the future, extreme and severe mental

17

anguish as well as mental and physical pain and injury. For such injury, Plaintiffs will incur significant damages based on psychological and medical care.

61.     As a further result of the conduct of each of these Defendants, Plaintiffs have been deprived of familial relationships, including the loss of their son, Sergio Derkevorkian, and the emotional impact on their family unit as a whole.

62.     The aforementioned acts of the Defendants, and each of them, was willful, wanton, malicious, oppressive, in bad faith and done with reckless disregard or with deliberate indifference to the constitutional rights of the Plaintiffs, entitling Plaintiffs to exemplary and punitive damages from each defendant other than Defendant COUNTY OF KERN in an amount to be proven at the trial of this matter.

63.     By reason of the above described acts and omissions of Defendants, Plaintiffs were required to retain an attorney to institute and prosecute the within action, and to render legal assistance to Plaintiffs that they might vindicate the loss and impairment of his rights, and by reason thereof, Plaintiffs request payment by Defendants of a reasonable sum for attorney's fees pursuant to 42 U.S.C. §1988, California Code of Civil Procedure §1021.5 and any other applicable provision of law.

## FIRST CLAIM FOR RELIEF

### DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. §1983
### DELIBERATE INDIFFERENCE TO
### SERIOUS MEDICAL NEEDS AND SAFETY
### (Against All Defendants and DOES 1-10, Except Defendant COUNTY)

64.     Plaintiffs reallege all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

65.     Plaintiffs are informed and believe, and based on such information and belief, allege that Defendants acted with deliberate indifference for Sergio Derkevorkian's serious medical needs and safety, in that they failed to provide

18

adequate psychiatric treatment and intervention; failed to perform adequate suicide risk assessment and screening; ignored specific notice that he was suicidal; inappropriately assigned Mr. Derkevorkian to Administrative Segregation housing despite clear indications that he required more intensive treatment and supervision; ignored and/or failed to reasonably monitor, to provide security, and to prevent Sergio Derkevorkian from committing harm to himself; failed to provide medically-indicated psychiatric care and assessment; and ignored his serious but treatable mental health condition. Due to Defendants' deliberate indifference to the serious nature and life threatening condition of Sergio Derkevorkian, and their failure to timely intervene to provide reasonable security, monitoring and safety, and psychiatric medical intervention necessary to prevent his efforts to harm himself, Sergio Derkevorkian suffered preventable serious injury and harm by hanging himself in his cell in May 2016.

66.    Sergio Derkevorkian was subjected to deprivation of rights by these Defendants and DOES 1 through 10, and each of them, acting under color of law and of statutes, ordinances, regulations, customs and usages of the Law of United States, State of California, which rights included, but are not limited to, privileges and immunities secured to Sergio Derkevorkian by the Fourth, Fourteenth or Eighth Amendments to the United States Constitution and laws of the United States, and particularly: a) his right to access to mental health and medical care and treatment for his serious but treatable condition; and b) his right to adequate, reasonable security, monitoring, supervision, classification and housing for his mental health and medical disabilities, each of which was also a cause of his serious injury and harm.

67.    Plaintiffs allege that these Defendants' wrongful conduct legally caused a deprivation of their constitutionally protected liberty interest in familial companionship, love and society of their son, all to their damage in an amount to be proven at trial according to proof.

## SECOND CLAIM FOR RELIEF

### DEPRIVATION OF CIVIL RIGHTS -- 42 U.S.C. §1983
### (Against Defendant COUNTY) – *MONELL* VIOLATIONS

68.　　Plaintiffs reallege all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

69.　　Plaintiffs are informed and believe and thereon allege that, at all times herein mentioned, Defendant COUNTY OF KERN with deliberate indifference and conscious and reckless disregard to the safety, security, and constitutional and statutory rights of Sergio Derkevorkian engaged in the unconstitutional conduct and omissions as is specifically elaborated herein above.

70.　　Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, Defendant COUNTY OF KERN, Kern County Sheriff's Department, and Department of Mental Health, with deliberate indifference, and/or conscious or reckless disregard to the safety and constitutional rights of Sergio Derkevorkian, and other inmates with severe mental health conditions, maintained, enforced, tolerated, ratified, permitted acquiesced in, and/or applied the policies, practices and customs set forth above, including, but not limited to: failure to provide adequate mental health services; failure to provide adequate suicide risk assessment and screening; failure to provide appropriate custodial supervision of inmates with mental health conditions – despite known suicide hazards; failure to ensure that mental health housing and treatment spaces meet minimum safety design standards for facilities in which persons with serious mental illness are held; failure to provide adequate training and supervision of employees regarding identifying mental health issues and suicide risk; failure to consider and relay specific information of suicide risk obtained from outside sources; failure to ensure sufficient treatment space and staffing necessary to provide adequate mental health care; failure to appropriately document bizarre behavior of inmates in shared incident reports; inadequate intake screening and assessment for housing

20

placement; inadequate monitoring and assessment of inmates' mental health conditions; insufficient mechanisms to ensure communication of relevant information between custodial, medical and mental health staff; failure to ensure appropriate suicide intervention measures; and, failure to ensure adequate training and retention of information by correctional staff in identifying mental health and suicide risk issues as well as appropriate response to mental health issues.

71. Plaintiffs are informed and believe, and thereon allege, that, at all times herein mentioned, individual Defendants' wrongful conduct was the result of policies, practices, and customs to subject inmates of the Kern County Jails with mental health conditions to unconstitutionally inadequate treatment; permit and promote unsafe conditions for inmates leading to a heightened risk of suicide; and cover-up incidents of unconstitutional behavior by members of its Kern Sheriff's Department custody staff and Department of Mental Health.

72. At all times herein mentioned, the County of Kern and its Sheriff's Office, and the Department of Mental Health authorized and ratified the wrongful acts of the individual Defendants. The actions and inactions of the Kern Sheriff's Department, including it custody staff, and the Department of Mental Health were known or should have been known to the policy makers responsible for Kern County, and occurred with deliberate indifference to either the recurring constitutional violations elaborated above, and/or to the strong likelihood that constitutional rights would be violated as a result of failing to train, supervise or discipline in areas where the need for such training and supervision was obvious.

73. The actions of the Kern Sheriff's Office, including it custody staff, the and the Department of Mental Health set forth herein were a moving force behind the violations of Plaintiffs' and Sergio Derkevorkian's constitutional rights as set forth in this complaint.

74. As a direct and proximate result of Defendant COUNTY's policies, practices, and customs, Plaintiffs sustained injury and damages.

21

75.     As a result of Defendants', and each of their, violations of Plaintiffs' and Sergio Derkevorkian's constitutional rights as set forth herein, Plaintiffs were damaged as alleged above.

### THIRD CLAIM FOR RELIEF

**DEPRIVATION OF CIVIL RIGHTS – 42 U.S.C. § 1983**
**FAILURE TO SUPERVISE, TRAIN AND TAKE CORRECTIVE**
**MEASURES CAUSING CONSTITUTIONAL VIOLATIONS**
**(Against Supervisory Defendants and DOES 1-10, Except Defendant**
**COUNTY)**

76.     Plaintiffs reallege all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

77.     Plaintiffs are informed and believe and thereon allege that Defendants YOUNGBLOOD, WALKER, and DOES 1-10 knew, or in the exercise of reasonable care, should have known of the history and propensity and pattern at the time of this incident for employees of the Kern County Jail to fail to provide reasonable security, monitoring, and supervision of inmates such as Sergio Derkevorkian; to fail to comply in implementing policies and procedures or ensuring the enforcement thereof; to fail to train (and insure adequate understanding and retention of training) and ensure that deputies, employees and medical care providers provide reasonable security and monitoring of inmates, such as Sergio Derkevorkian; and that they provide prompt and competent access and delivery of mental health attention and intervention when inmates, such as Sergio Derkevorkian, were having a mental health crisis requiring prompt intervention.  Defendants' disregard of this knowledge or failure to adequately investigate and discover and correct such acts or failures to act was a moving force which caused the violation of Plaintiffs' constitutional rights.

78.     Plaintiffs are informed and believe and thereon allege that prior to the incident alleged herein, Defendants YOUNGBLOOD and WALKER and DOES 1-10, acting under the color of their authority as supervisory officers of deputies,

22

counselors, physicians, nurses, staff and all mental health and medical care providers, and in the course and scope of their employment as such, committed similar acts of:

    a.    Failure to provide access to and delivery of mental health and medical care and treatment for inmates at Kern County with known mental disabilities;

    b.    Failure to provide adequate housing and properly classify inmates in the Kern County Jails so that they would have access to and delivery of indicated mental health and medical care;

    c.    Failure to provide adequate and reasonable monitoring and housing for inmates that present a risk of suicide to prevent mental health disasters such as attempted suicides and suicides;

    d.    Failure to prevent employee "burn out" and repetitive tasks, a known cause of failure to treat mental health issues in jails;

    e.    Failure to supervise their subordinates to ensure that staff, deputies and employees were implementing and complying with implementing policies and procedures to ensure the reasonable security and safety of inmates;

    f.    Failure to receive and disseminate information regarding inmate mental health received from outside sources including transporting/arresting officers and family members to mental health or custody staff;

    g.    Failure to adequately screen inmates for mental health issues or suicide risk upon booking; and

23

h.   Discriminating against inmates with known mental health disabilities by use of a disciplinary system that increases incarceration and imposes punishment for behavior resulting from or caused by their mental health disability.

79.   Plaintiffs are further informed and believe and thereon allege that Defendants YOUNGBLOOD, WALKER and DOES 1-10, knew, or in the exercise of reasonable care should have known, of this pattern or practice of unconstitutional violations, or the existence of facts which create the potential of unconstitutional acts, and these Defendants and DOES 1-10 had a duty to train and instruct their subordinates to prevent similar acts to other inmates, but failed to take steps to properly train, supervise, investigate or instruct deputies, counselors, physicians and nurses, and/or agents or employees, and to retain deputies, counselors, physicians and nurses who had a history of inappropriate conduct, and as a result Sergio Derkevorkian was harmed in the manner threatened by the pattern or practice.

80.   At all times herein mentioned, and prior thereto, Defendants had the duty to perform the following, and violated that duty:

a.   To train, supervise, and instruct deputies, counselors, nurses, physician assistants, physicians, and other agents to ensure that they respected and did not violate federal and state constitutional and statutory rights of inmates;

b.   To objectively investigate incidents of in-custody injury, deaths, suicides and suicide attempts, inadequate classification and contraindicated housing, and to take remedial action;

c.   To provide access to and delivery of mental and medical health care, intervention, treatment, follow-up, and attention to injured, ill or potentially suicidal inmates, the

24

lack of which resulted in serious injury or loss of life, and to provide access and delivery of competent mental and medical health care;

d.  To periodically monitor an inmate's serious mental health and medical condition and suicide prevention, the lack of which may result in serious injury or loss of life;

e.  To periodically monitor the quality and adequacy of mental health and medical care, attention and treatment provided to mentally ill inmates;

f.  To periodically monitor the competency of medical and custodial staffing to ensure that custodial deputies and staff were complying with reasonable security to inmates with mental health disabilities at Kern County Jails;

g.  To periodically monitor the classification and housing of mentally ill inmates to ensure they have reasonable security and safety and are properly housed, and not housed with or exposed to persons with known dangerous propensities;

h.  To comply with the statutory guidelines and regulations enacted for the protection of inmates held in a custodial setting;

i.  To discipline and to establish procedures to correct past violations, and to prevent future occurrences of violation of constitutional rights of inmates, by not condoning, ratifying, and/or encouraging the violation of Sergio Derkevorkian's and other inmate's constitutional rights;

j.   To periodically train custodial staff and counselors on understanding, recognizing, reporting and responding to issues of inmates' mental health care and treatment; and

k.   Not to discriminate against inmates with known mental health disabilities by use of a disciplinary system that increases incarceration and imposes punishment for behavior resulting from or caused by their mental health disability

l.   To appropriately disseminate information regarding an inmate's behavior from arresting/transporting officers and/or family members to appropriate custody and mental health staff.

81.   As a legal result of the conduct of Defendants YOUNGBLOOD, WALKER and Does 1-10, as described above, Plaintiffs were damaged as alleged herein and as set forth above.

## FOURTH CLAIM FOR RELIEF

### NEGLIGENCE
**(Against All Defendants and DOES 1-10, Except Defendant COUNTY)**

82.   Plaintiffs reallege all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

83.   Defendants and DOES 1-10, had a duty to provide reasonable security and render access and delivery of mental and medical care, treatment, and/or emergency services to Sergio Derkevorkian for his mental health condition, but breached their duty and were negligent in the performance of their duties and this negligence caused the death of Sergio Derkevorkian.

84.   Defendants and DOE supervisors 1-10, acting within the course and scope of their employment with the Kern Sheriff's Department and the Department of Mental Health and had a duty to assure the competence of their employee/agents

26

Defendants and DOES 1-10, but breached their duty and were negligent in the performance of their duties by selecting, hiring, training, reviewing, periodically supervising, failing to supervise, evaluating the competency and retaining their Defendant deputies, counselors, physicians and/or employees and/or agents.  This breach of the duty of careful selection, hiring, training, review, supervision, periodic evaluation of the competency, and retention of such officers, counselors and other staff created an unreasonable risk of harm to persons such as Sergio Derkevorkian.

85.    The individually named Defendants breached their duty of care to observe, screen, report, monitor and provide reasonable security regarding Sergio Derkevorkian's condition and failed to prevent his suicide.

86.    As a direct and legal result of the aforesaid negligence, carelessness and unskillfulness of Defendants, and each of them, and as a result of their breach of duty of care to Sergio Derkevorkian, he was injured due to a serious but treatable mental health condition and Plaintiffs have suffered the damages as alleged above.

87.    As a legal result of the aforesaid negligence and unskillfulness of Defendants, Sergio Derkevorkian's trauma and injuries and/or suicidal ideation condition did not receive timely, appropriate and indicated intervention and treatment and his condition worsened and resulted in his suicide, and he suffered serious injury and harm as a legal cause of the negligent conduct of Defendants, thereby causing damage as alleged above.

## FIFTH CLAIM FOR RELIEF

### VIOLATION OF CALIFORNIA GOV'T CODE § 845.6
### (Against All Defendants Except Defendant COUNTY)

88.    Plaintiffs reallege all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

27

89.   By virtue of the foregoing, Defendants, including but not limited to representatives of the Kern County Sheriff's Office and the Department of Mental Health knew, or had reason to know, that Sergio Derkevorkian needed intensive medical care and that he had serious and obvious mental and medical conditions that put the staff on notice that he should have had his medical and mental condition closely monitored, going forward from May 3, 2016; that on or before May 6, 2014 he needed immediate medical care and was not given such care. The failure to provide immediate medical care and mental health care, where his health and mental condition were deteriorating, proximately caused his suicide.

### SIXTH CLAIM FOR RELIEF

**VIOLATION OF AMERICANS WITH DISABILITIY ACT (ADA), TITLE II, 42 U.S.C. §12101 et seq., THE REHABILITATION ACT, 29 U.S.C. §794, AND CALIFORNA UNRUH ACT, CAL. CIVIL CODE §§51, et seq. (Against All Defendants and Defendant COUNTY)**

90.   Plaintiffs reallege all the foregoing paragraphs, as well as any subsequent paragraphs contained in the complaint, as if fully set forth herein.

91.   Sergio Derkevorkian was a "qualified individual," with a mental impairment that substantially limited his ability to care for himself and control his mental, medical or physical health condition as defined under the Americans with Disabilities Act (ADA), 42 U.S.C. §12131 (2), under Section 504 of the Rehabilitation Act of 1973 (RA), 29 U.S.C. §794 and Cal. Civ. Code §51, et seq., and qualified as an individual with a disability under California law, and he met the essential eligibility requirements of the County of Kern and Kern Sheriff's Department's programs to provide mental/medical health care services for its inmate patients in the Kern Sheriff's Department.

92.   Defendant KERN COUNTY and its jails and mental health services are a place of public accommodation and a covered entity for purposes of enforcement of the ADA, 42 U.S.C. §12131 (2), under Section 504 of the

28

Rehabilitation Act of 1973, and Cal. Civ. Code §51, et. seq., explicated by the regulations promulgated under each of these laws.

93.    Defendant Kern County mental health services "engaged in the business of . . . health care," custody for persons whose "operations" fall within the definition of "program or activity" covered by the Rehabilitation Act, 29 U.S.C. Section 794(b).

94.    Under the ADA, Kern County is mandated to "develop an effective, integrated, comprehensive system for the delivery of all services to persons with mental disabilities and developmental disabilities. . ." and to ensure "that the personal and civil rights" of persons who are receiving services under its aegis are protected.

95.    Congress enacted the ADA upon a finding, among other things, that "society has tended to isolate and segregate individuals with disabilities" and that such forms of discrimination continue to be a "serious and pervasive social problems." 42 U.S.C. §12101(a)(2).

96.    KERN COUNTY is mandated under the ADA not to discriminate against any qualified individual on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." 42 U.S.C. §12182 (a).

97.    Defendant KERN COUNTY receives federal financial assistance for their jails, and therefore must comply with the mandates of the Rehabilitation Act, §504, which specifies that "program or activity" means all of the operations of … A department, agency, special purpose district, or other instrumentality of a State or of a local government.

98.    Defendant KERN COUNTY and other Defendants violated the ADA and the RA and Cal. Civ. Code §51, et seq., and deprived Sergio Derkevorkian and Plaintiffs of their federally and state protected rights by: (a) creating and maintaining a number of programs and services to protect the mentally disabled

that operate in conjunction with KERN COUNTY's jails; (b) failing to provide services or accommodate Sergio Derkevorkian with access to the programs and services of KERN COUNTY'S designated mental health facilities within Kern County Jails for persons who qualify for access and services under California and federal law; (c) failing to provide services or accommodate Sergio Derkevorkian as indicated and with appropriate classification, housing and monitoring for a person in their sole and exclusive custody who they knew was mentally disabled; (d) failing to provide reasonable accommodations to people in custody with mental disabilities at their jails, and providing instead quality of care and service that is different, separate, and worse than the service provided to other individuals with the same disabilities; (e) failing to properly train its deputies, medical and mental health staff, employees and officers on how to peacefully respond, treat, and interact with disabled persons, such as Sergio Derkevorkian; and (f) failing to comply with the U.S. Department of Justice requirements regarding care, treatment and security to persons with mental disabilities, resulting in discrimination against Sergio Derkevorkian, under the ADA and RA.

99.     Sergio Derkevorkian was denied the benefits of the services, programs, and activities of KERN COUNTY which deprived him of mental health and medical health programs and services which would have provided the delivery of treatment, follow-up and supervision. This denial of programs and services was the result of his disability in that he was discriminated against because he was mentally ill and gravely disabled, in that he suffered from conditions in which a person, as a result of a mental disorder, is unable to provide for his basic personal needs and to protect himself from self-harm. Defendants' failure to train their employees, and the denial of mental and medical health care, treatment, follow-up, training, supervision was result in the violation of Plaintiffs' constitutional rights.

100.   As a legal result of the acts and misconduct of the Defendants and each Defendant complained of herein, Sergio Derkevorkian died and Plaintiffs

have suffered, are now suffering and will continue to suffer damages as alleged herein.

### **PRAYER FOR RELIEF**

WHEREFORE Plaintiffs ANA MARIA GONZALEZ LOPEZ and PEDRO DERKEVORKIAN request relief on their own behalf, and on behalf of Sergio Derkevorkian, as follows, and according to proof, against each Defendant:

1.   General and compensatory damages in an amount according to proof;

2.   Special damages in an amount according to proof;

3.   Exemplary and punitive damages against each Defendant, except the COUNTY OF KERN, in an amount according to proof;

4.   Costs of suit, including attorneys' fees, under 42 U.S.C. §1988, California Code of Civil Procedure §1021.5 and any other applicable provision of law; and,

5.   Such other relief as may be warranted or as is just and proper.


Respectfully submitted,

KAYE, McLANE, BEDNARSKI & LITT, LLP


DATED:   June 1, 2018        By:  / s /      Ronald O. Kaye
                                  RONALD O. KAYE
                                  KEVIN J. LAHUE
                                  Attorneys for Plaintiffs
                                  ANA MARIA GONZALEZ LOPEZ
                                  PEDRO DERKEVORKIAN

31

1

## **JURY DEMAND**

2

3       Trial by jury of all issues is demanded.

4

5                               KAYE, McLANE, BEDNARSKI & LITT,  LLP

6   DATED: June 1, 2018              By: */ s /      Ronald O. Kaye*
7                                       RONALD O. KAYE
8                                       KEVIN J. LAHUE
                                        Attorneys for Plaintiffs
9                                       ANA MARIA GONZALEZ LOPEZ
                                        PEDRO DERKEVORKIAN
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  RONALD O. KAYE, SBN 145051
2  Email: rok@kmbllaw.com
   KEVIN J. LaHUE, SBN 237556
3  Email: klahue@kmbllaw.com
4  KAYE, McLANE, BEDNARSKI & LITT, LLP
   975 East Green Street
5  Pasadena, CA 91106
6  Tel: (626) 844-7660
   Fax: (626) 844-7670
7

8  Attorneys for Plaintiffs
9  ANA MARIA GONZALEZ LOPEZ
   PEDRO DERKEVORKIAN
10

11             UNITED STATES DISTRICT COURT

12            EASTERN DISTRICT OF CALIFORNIA

13

14
   ANA MARIA GONZALEZ              CASE NO.: 1:17-CV-00864-AWI-JLT
15 LOPEZ, PEDRO
16 DERKEVORKIAN, AND THE           [Hon. Jennifer L. Thurston]
   ESTATE OF SERGIO
17 DERKEVORKIAN,                    DECLARATION OF PLAINTIFF
                                    PEDRO DERKEVORKIAN (Cal. Code
18                                  Civ. Pro. §377.32); EXHIBIT 1 DEATH
                    Plaintiff,      CERTIFICATE
19
        v.
20

21 COUNTY OF KERN; SHERIFF
   DONNY YOUNGBLOOD; BILL
22 WALKER, DIRECTOR KERN
23 COUNTY MENTAL HEALTH
   DEPARTMENT; DEPUTY
24 ASHLEY MARCUM (#202548);
25 and DOES 1 through 10, inclusive

26
                    Defendants.
27

28

                              1

In compliance with California Code of Civil Procedure § 377.32, Plaintiff Pedro Derkevorkian hereby declares as follows:

1.     That I am the father of Sergio Derkevorkian.

2.     That my son, Sergio Derkevorkian, died on May 8, 2016 in Bakersfield, California.

3.     That no proceeding is now pending in California for administration of the estate of my son, Sergio Derkevorkian.

4.     That I am a successor in interest to my son's estate, as defined in Section 377.11 of the California Code of Civil Procedure, because I am a beneficiary of his estate.

5.     That my son, Sergio Derkevorkian, did not leave a will, and did not father any children.

6.     That I am therefore a beneficiary of his estate under California law, as set forth in California Probate Code § 6401(c)(2)(B).

7.     That I succeed to Sergio Derkevorkian's interest in this action.

8.     That my wife, Ana Maria Gonzalez Lopez, is also a plaintiff in this matter and a successor in interest to my son's estate and that no other person has a superior right to commence the action or to be substituted for the decedent in the pending action or proceeding.

\\

2

9.    Attached hereto as Exhibit 1 is a certified copy of the death certificate of my son, Sergio Derkevorkian.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _____ day of May 2016 in _____, California

_____
PEDRO DERKEVORKIAN

3

**Exhibit 1**

# COUNTY of KERN
## PUBLIC HEALTH SERVICES DEPARTMENT
### 1800 MT. VERNON AVE., BAKERSFIELD, CALIFORNIA 93306-3302

3052016097723

**CERTIFICATE OF DEATH**
STATE OF CALIFORNIA
USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS
VS-11/REV 3/06

STATE FILE NUMBER

3201615002070
LOCAL REGISTRATION NUMBER

| | | |
|---|---|---|
| 1. NAME OF DECEDENT – FIRST (Given) **SERGIO** | 2. MIDDLE | 3. LAST (Family) **DERKEVORKIAN** |

AKA, ALSO KNOWN AS – include full AKA (FIRST, MIDDLE, LAST)

| 4. DATE OF BIRTH mm/dd/ccyy **06/24/1986** | 5. AGE Yrs. **29** | IF UNDER ONE YEAR Months / Days | IF UNDER 24 HOURS Hours / Minutes | 6. SEX **M** |
|---|---|---|---|---|

| 8. BIRTH STATE/FOREIGN COUNTRY **SPAIN** | 10. SOCIAL SECURITY NUMBER **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** | 11. EVER IN U.S. ARMED FORCES? YES [X] NO UNK | 12. MARITAL STATUS/SRDP (at Time of Death) **NEVER MARRIED** | 7. DATE OF DEATH mm/dd/ccyy **05/08/2016** | 8. HOUR (24 Hours) **1837** |
|---|---|---|---|---|---|

| 13. EDUCATION – Highest Level/Degree **HS GRADUATE** | 14/15. WAS DECEDENT HISPANIC/LATINO/A/SPANISH? (If yes, see worksheet on back) [X] YES **SPAIN** NO | 16. DECEDENT'S RACE – Up to 3 races may be listed (see worksheet on back) **CAUCASIAN** |
|---|---|---|

| 17. USUAL OCCUPATION – Type of work for most of life. DO NOT USE RETIRED. **INDEPENDENT CONTRACTOR** | 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) **CONSTRUCTION** | 19. YEARS IN OCCUPATION **5** |
|---|---|---|

**20. DECEDENT'S RESIDENCE (Street and number, or location)** 19221 SHERMAN WAY #28

| 21. CITY **RESEDA** | 22. COUNTY/PROVINCE **LOS ANGELES** | 23. ZIP CODE **91335** | 24. YEARS IN COUNTY **27** | 25. STATE/FOREIGN COUNTRY **CALIFORNIA** |
|---|---|---|---|---|

26. INFORMANT'S NAME, RELATIONSHIP **ANA MARIA GONZALEZ, MOTHER**
27. INFORMANT'S MAILING ADDRESS (Street and number, or rural route number, city or town, state and zip) **19221 SHERMAN WAY #26, RESEDA, CA 91335**

| 28. NAME OF SURVIVING SPOUSE/SRDP–FIRST - | 29. MIDDLE - | 30. LAST (BIRTH NAME) - |
|---|---|---|

| 31. NAME OF FATHER/PARENT–FIRST **BEDROS** | 32. MIDDLE - | 33. LAST **DERKEVORKIAN** | 34. BIRTH STATE **LEBANON** |
|---|---|---|---|

| 35. NAME OF MOTHER/PARENT–FIRST **ANA** | 36. MIDDLE **MARIA** | 37. LAST (BIRTH NAME) **GONZALEZ** | 38. BIRTH STATE **SPAIN** |
|---|---|---|---|

| 39. DISPOSITION DATE mm/dd/ccyy **05/18/2016** | 40. PLACE OF FINAL DISPOSITION **RESIDENCE OF ANA MARIA GONZALEZ** 19221 SHERMAN WAY #26, RESEDA, CA 91335 |
|---|---|

| 41. TYPE OF DISPOSITION(S) **CR/RES** | 42. SIGNATURE OF EMBALMER ▶ **NOT EMBALMED** | 43. LICENSE NUMBER - |
|---|---|---|

| 44. NAME OF FUNERAL ESTABLISHMENT **ANGELENO MORTUARY** | 45. LICENSE NUMBER **FD1812** | 46. SIGNATURE OF LOCAL REGISTRAR ▶ **CLAUDIA JONAH, MD** | 47. DATE mm/dd/ccyy **05/16/2016** |
|---|---|---|---|

| 101. PLACE OF DEATH **SAN JOAQUIN COMMUNITY HOSPITAL** | 102. IF HOSPITAL, SPECIFY ONE [X] IP ER/OP DOA | 103. IF OTHER THAN HOSPITAL, SPECIFY ONE Hospice Nursing Home/LTC Decedent's Home Other |
|---|---|---|

| 104. COUNTY **KERN** | 105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location) **2615 CHESTER AVENUE** | 106. CITY **BAKERSFIELD** |
|---|---|---|

107. CAUSE OF DEATH — Enter the chain of events — diseases, injuries, or complications — that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE.

| | | Time Interval Between Onset and Death | 108. DEATH REPORTED TO CORONER? |
|---|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | (A) **ASPHYXIA** | (A) **DAYS** | [X] YES NO **CO1063-16** |
| Sequentially, list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST | (B) **HANGING** | (B) **DAYS** | 109. BIOPSY PERFORMED? YES [X] NO |
| | (C) | (C) | 110. AUTOPSY PERFORMED? [X] YES NO |
| | (D) | (D) | 111. USED IN DETERMINING CAUSE? [X] YES NO |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 **NONE** |
|---|

| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date.) **NO** | 113A. IF FEMALE, PREGNANT IN LAST YEAR? YES NO UNK |
|---|---|

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. Decedent Attended Since ___ mm/dd/ccyy   Decedent Last Seen Alive ___ mm/dd/ccyy | 115. SIGNATURE AND TITLE OF CERTIFIER ▶ | 116. LICENSE NUMBER | 117. DATE mm/dd/ccyy |
|---|---|---|---|

| 118. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. MANNER OF DEATH Natural Accident Homicide [X] Suicide Pending Investigation Could not be determined | 120. INJURED AT WORK? [X] YES NO UNK | 121. INJURY DATE mm/dd/ccyy **05/07/2016** | 122. HOUR (24 Hours) **UNK** |
|---|---|---|---|

| 123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.) **CORRECTIONAL FACILITY** |
|---|

| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) **SELF-INFLICTED LIGATURE HANGING** |
|---|

| 125. LOCATION OF INJURY (Street and number, or location, and city, and zip) **LERDO PRE-TRIAL FACILITY** 17695 INDUSTRIAL FARM ROAD, BAKERSFIELD, CA 93308 |
|---|

| 126. SIGNATURE OF CORONER / DEPUTY CORONER **CHRISTOPHER N FRANK** | 127. DATE mm/dd/ccyy **05/12/2016** | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER **CHRISTOPHER N FRANK, DEPUTY CORONER** |
|---|---|---|

| STATE REGISTRAR | A | B | C | D | E | *010001003244621* | FAX AUTH.# | CENSUS TRACT |
|---|---|---|---|---|---|---|---|---|

---

## CERTIFIED COPY OF VITAL RECORDS

STATE OF CALIFORNIA } ss
COUNTY OF KERN

DATE ISSUED **JUL 0 6 2016**

This is a true and exact reproduction of the document officially registered and placed on file in the office of the VITAL RECORDS SECTION OF THE DEPARTMENT OF PUBLIC HEALTH SERVICES.

*000581241*

**CLAUDIA JONAH, M.D.**
PUBLIC HEALTH OFFICER AND LOCAL REGISTRAR
OF BIRTHS AND DEATHS

PRINCO (Rev. 03/11)

This copy is not valid unless prepared on engraved border displaying seal and signature of registrar

ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE

1  RONALD O. KAYE, SBN 145051
2  Email: rok@kmbllaw.com
   KEVIN J. LaHUE, SBN 237556
3  Email: klahue@kmbllaw.com
4  KAYE, McLANE, BEDNARSKI & LITT, LLP
   975 East Green Street
5  Pasadena, CA 91106
6  Tel: (626) 844-7660
   Fax: (626) 844-7670
7
8  Attorneys for Plaintiffs
9  ANA MARIA GONZALEZ LOPEZ
   PEDRO DERKEVORKIAN
10
11              UNITED STATES DISTRICT COURT
12             EASTERN DISTRICT OF CALIFORNIA
13

| | |
|---|---|
| 14  ANA MARIA GONZALEZ LOPEZ, PEDRO DERKEVORKIAN, AND THE ESTATE OF SERGIO DERKEVORKIAN,<br><br>                    Plaintiff,<br><br>      v.<br><br>COUNTY OF KERN; SHERIFF DONNY YOUNGBLOOD; BILL WALKER, DIRECTOR KERN COUNTY MENTAL HEALTH DEPARTMENT; DEPUTY ASHLEY MARCUM (#202548); and DOES 1 through 10, inclusive<br><br>                    Defendants. | CASE NO.: 1:17-CV-00864-AWI-JLT<br><br>[Hon. Jennifer L. Thurston]<br><br>DECLARATION OF PLAINTIFF ANA MARIA GONZALEZ LOPEZ (Cal. Code Civ. Pro. §377.32); EXHIBIT 1 DEATH CERTIFICATE |

1

In compliance with California Code of Civil Procedure § 377.32, Plaintiff Ana Maria Gonzalez Lopez hereby declares as follows:

1.      That I am the mother of Sergio Derkevorkian.

2.      That my son, Sergio Derkevorkian, died on May 8, 2016 in Bakersfield, California.

3.      That no proceeding is now pending in California for administration of the estate of my son, Sergio Derkevorkian.

4.      That I am a successor in interest to my son's estate, as defined in Section 377.11 of the California Code of Civil Procedure, because I am a beneficiary of his estate.

5.      That my son, Sergio Derkevorkian, did not leave a will, and did not father any children.

6.      That I am therefore a beneficiary of his estate under California law, as set forth in California Probate Code § 6401(c)(2)(B).

7.      That I succeed to Sergio Derkevorkian's interest in this action.

8.      That my husband, Pedro Derkevorkian, is also a plaintiff in this matter and a successor in interest to my son's estate and that no other person has a superior right to commence the action or to be substituted for the decedent in the pending action or proceeding.

\\

2

9.      Attached hereto as Exhibit 1 is a certified copy of the death certificate of my son, Sergio Derkevorkian.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

Executed this _____ day of May 2016 in _____, California

_____
ANA MARIA GONZALEZ LOPEZ

3

**Exhibit 1**

# COUNTY of KERN
## PUBLIC HEALTH SERVICES DEPARTMENT
### 1800 MT. VERNON AVE., BAKERSFIELD, CALIFORNIA 93306-3302

| 3052016097723 | CERTIFICATE OF DEATH | 3201615002070 |
|---|---|---|
| STATE FILE NUMBER | STATE OF CALIFORNIA — USE BLACK INK ONLY / NO ERASURES, WHITEOUTS OR ALTERATIONS | LOCAL REGISTRATION NUMBER |

**DECEDENT'S PERSONAL DATA**

| 1. NAME OF DECEDENT—FIRST (Given) | 2. MIDDLE | 3. LAST (Family) | | |
|---|---|---|---|---|
| SERGIO | | DERKEVORKIAN | | |
| AKA, ALSO KNOWN AS – include full AKA (FIRST, MIDDLE, LAST) | | 4. DATE OF BIRTH mm/dd/ccyy 06/24/1986 | 5. AGE Yrs. 29 | IF UNDER ONE YEAR / IF UNDER 24 HOURS | 6. SEX M |

| 9. BIRTH STATE/FOREIGN COUNTRY | 10. SOCIAL SECURITY NUMBER | 11. EVER IN U.S. ARMED FORCES? | 12. MARITAL STATUS/SRDP (at Time of Death) | 7. DATE OF DEATH mm/dd/ccyy | 8. HOUR (24 Hours) |
|---|---|---|---|---|---|
| SPAIN | 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 | ☐ YES ☒ NO ☐ UNK | NEVER MARRIED | 05/08/2016 | 1837 |

| 13. EDUCATION – Highest Level/Degree | 14/15. WAS DECEDENT HISPANIC/LATINO(A)/SPANISH? (If yes, see worksheet on back) | 16. DECEDENT'S RACE – Up to 3 races may be listed (see worksheet on back) |
|---|---|---|
| HS GRADUATE | ☒ NO ☐ YES SPAIN | CAUCASIAN |

| 17. USUAL OCCUPATION – Type of work for most of life. DO NOT USE RETIRED. | 18. KIND OF BUSINESS OR INDUSTRY (e.g., grocery store, road construction, employment agency, etc.) | 19. YEARS IN OCCUPATION |
|---|---|---|
| INDEPENDENT CONTRACTOR | CONSTRUCTION | 5 |

**USUAL RESIDENCE**

| 20. DECEDENT'S RESIDENCE (Street and number, or location) |
|---|
| 19221 SHERMAN WAY #26 |

| 21. CITY | 22. COUNTY/PROVINCE | 23. ZIP CODE | 24. YEARS IN COUNTY | 25. STATE/FOREIGN COUNTRY |
|---|---|---|---|---|
| RESEDA | LOS ANGELES | 91335 | 27 | CALIFORNIA |

**INFORMANT**

| 26. INFORMANT'S NAME, RELATIONSHIP | 27. INFORMANT'S MAILING ADDRESS (Street and number, or rural route number, city or town, state and zip) |
|---|---|
| ANA MARIA GONZALEZ, MOTHER | 19221 SHERMAN WAY #26, RESEDA, CA 91335 |

**SPOUSE/SRDP AND PARENT INFORMATION**

| 28. NAME OF SURVIVING SPOUSE/SRDP—FIRST | 29. MIDDLE | 30. LAST (BIRTH NAME) | |
|---|---|---|---|
| - | - | - | |
| 31. NAME OF FATHER/PARENT—FIRST | 32. MIDDLE | 33. LAST | 34. BIRTH STATE |
| BEDROS | | DERKEVORKIAN | LEBANON |
| 35. NAME OF MOTHER/PARENT—FIRST | 36. MIDDLE | 37. LAST (BIRTH NAME) | 38. BIRTH STATE |
| ANA | MARIA | GONZALEZ | SPAIN |

**FUNERAL DIRECTOR/LOCAL REGISTRAR**

| 39. DISPOSITION DATE mm/dd/ccyy | 40. PLACE OF FINAL DISPOSITION | |
|---|---|---|
| 05/18/2016 | RESIDENCE OF ANA MARIA GONZALEZ 19221 SHERMAN WAY #26, RESEDA, CA 91335 | |

| 41. TYPE OF DISPOSITIONS | 42. SIGNATURE OF EMBALMER | 43. LICENSE NUMBER |
|---|---|---|
| CR/RES | ▶ NOT EMBALMED | - |
| 44. NAME OF FUNERAL ESTABLISHMENT | 45. LICENSE NUMBER | 46. SIGNATURE OF LOCAL REGISTRAR | 47. DATE mm/dd/ccyy |
| ANGELENO MORTUARY | FD1812 | ▶ CLAUDIA JONAH, MD | 05/16/2016 |

**PLACE OF DEATH**

| 101. PLACE OF DEATH | 102. IF HOSPITAL, SPECIFY ONE | 103. IF OTHER THAN HOSPITAL, SPECIFY ONE |
|---|---|---|
| SAN JOAQUIN COMMUNITY HOSPITAL | ☒ IP ☐ ER/OP ☐ DOA | ☐ Hospice ☐ Nursing Home/LTC ☐ Decedent's Home ☐ Other |
| 104. COUNTY | 105. FACILITY ADDRESS OR LOCATION WHERE FOUND (Street and number, or location) | 106. CITY |
| KERN | 2615 CHESTER AVENUE | BAKERSFIELD |

**CAUSE OF DEATH**

| 107. CAUSE OF DEATH | Enter the chain of events — diseases, injuries, or complications — that directly caused death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. DO NOT ABBREVIATE. | | Time Interval Between Onset and Death | 108. DEATH REPORTED TO CORONER? |
|---|---|---|---|---|
| IMMEDIATE CAUSE (Final disease or condition resulting in death) | (A) ASPHYXIA | | (A) DAYS | ☒ YES ☐ NO CO1063-16 |
| Sequentially, list conditions, if any, leading to cause on Line A. Enter UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST | (B) HANGING | | (B) DAYS | 109. BIOPSY PERFORMED? ☐ YES ☒ NO |
| | (C) | | (C) | 110. AUTOPSY PERFORMED? ☒ YES ☐ NO |
| | (D) | | (D) | 111. USED IN DETERMINING CAUSE? ☒ YES ☐ NO |

| 112. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RESULTING IN THE UNDERLYING CAUSE GIVEN IN 107 |
|---|
| NONE |

| 113. WAS OPERATION PERFORMED FOR ANY CONDITION IN ITEM 107 OR 112? (If yes, list type of operation and date.) | 113A. IF FEMALE, PREGNANT IN LAST YEAR? |
|---|---|
| NO | ☐ YES ☐ NO ☐ UNK |

**PHYSICIAN'S CERTIFICATION**

| 114. I CERTIFY THAT TO THE BEST OF MY KNOWLEDGE DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | 115. SIGNATURE AND TITLE OF CERTIFIER | 116. LICENSE NUMBER | 117. DATE mm/dd/ccyy |
|---|---|---|---|
| Decedent Attended Since ___ mm/dd/ccyy / Decedent Last Seen Alive ___ mm/dd/ccyy | ▶ | | |
| | 118. TYPE ATTENDING PHYSICIAN'S NAME, MAILING ADDRESS, ZIP CODE | | |

**CORONER'S USE ONLY**

| 119. I CERTIFY THAT IN MY OPINION DEATH OCCURRED AT THE HOUR, DATE, AND PLACE STATED FROM THE CAUSES STATED. | 120. INJURED AT WORK? | 121. INJURY DATE mm/dd/ccyy | 122. HOUR (24 Hours) |
|---|---|---|---|
| MANNER OF DEATH: ☐ Natural ☐ Accident ☐ Homicide ☒ Suicide ☐ Pending Investigation ☐ Could not be determined | ☒ YES ☐ NO ☐ UNK | 05/07/2016 | UNK |
| 123. PLACE OF INJURY (e.g., home, construction site, wooded area, etc.) | | | |
| CORRECTIONAL FACILITY | | | |
| 124. DESCRIBE HOW INJURY OCCURRED (Events which resulted in injury) | | | |
| SELF-INFLICTED LIGATURE HANGING | | | |
| 125. LOCATION OF INJURY (Street and number, or location, and city, and zip) | | | |
| LERDO PRE-TRIAL 17695 INDUSTRIAL FARM ROAD, BAKERSFIELD, CA 93308 | | | |
| 126. SIGNATURE OF CORONER / DEPUTY CORONER | 127. DATE mm/dd/ccyy | 128. TYPE NAME, TITLE OF CORONER / DEPUTY CORONER | |
| ▶ CHRISTOPHER N FRANK | 05/12/2016 | CHRISTOPHER N FRANK, DEPUTY CORONER | |

| STATE REGISTRAR | A | B | C | D | E | | FAX AUTH.# | CENSUS TRACT |
|---|---|---|---|---|---|---|---|---|
| | | | | | | *010001003244821* | | |

## CERTIFIED COPY OF VITAL RECORDS

STATE OF CALIFORNIA } ss
COUNTY OF KERN

DATE ISSUED

**JUL 0 6 2016**



This is a true and exact reproduction of the document officially registered and placed on file in the office of the VITAL RECORDS SECTION OF THE DEPARTMENT OF PUBLIC HEALTH SERVICES.

*000581241*

CLAUDIA JONAH, M.D.
PUBLIC HEALTH OFFICER AND LOCAL REGISTRAR
OF BIRTHS AND DEATHS

This copy is not valid unless prepared on engraved border displaying seal and signature of registrar

PRINCO-004 03/13



ANY ALTERATION OR ERASURE VOIDS THIS CERTIFICATE